# EXHIBIT 9

# PROPERTY MANAGEMENT AGREEMENT

### Between

Hunting Fox Associates I, L.P., a Pennsylvania limited partnership;

Hunting Fox Associates III, L.P., a Pennsylvania limited partnership;

Hunting Fox Associates IV, L.P., a Pennsylvania limited partnership;

Hunting Fox V, L.P., a Pennsylvania limited partnership;

Hunting Fox TCI III, L.P., a Pennsylvania limited partnership;

Hunting Fox TCI IV, L.P., a Pennsylvania limited partnership

and

## TRAMMELL CROW SERVICES, INC.

Date:   August 14, 2006

Trammell Crow Company

# TABLE OF CONTENTS

Page No.

## ARTICLE 1
### APPOINTMENT AND AUTHORITY OF MANAGER

Section 1.1   Appointment .................................................................................................. 1
Section 1.2   Commencement Date .................................................................................... 1

## ARTICLE 2
### MANAGER'S AGREEMENTS

Section 2.1   General Responsibility .................................................................................. 2
Section 2.2   Independent Contractor ................................................................................ 2
Section 2.3   Subordination and Attornment ..................................................................... 2

## ARTICLE 3
### SERVICES OF MANAGER

Section 3.1   For Owner's Account ..................................................................................... 2
Section 3.2   Standards ...................................................................................................... 3
Section 3.3   Computer Software ....................................................................................... 3
Section 3.4   Financial Reports and Records .................................................................... 3
Section 3.5   Budgets ......................................................................................................... 4
Section 3.6   Bank Account ................................................................................................ 5
Section 3.7   Employees ..................................................................................................... 8
Section 3.8   Collection of Rents and Other Income .......................................................... 9
Section 3.9   Maintenance, Repairs, Alterations ............................................................... 9
Section 3.10  Capital Expenditures .................................................................................. 11
Section 3.11  Service Contracts ....................................................................................... 11
Section 3.12  Compliance With Laws ............................................................................... 12
Section 3.13  Notification of Litigation ............................................................................. 12
Section 3.14  Management Office ..................................................................................... 12
Section 3.15  Business Plan ............................................................................................. 13
Section 3.16  Contracts with Affiliated Entities ................................................................ 13
Section 3.17  Complaints and Notices ............................................................................. 13
Section 3.18  Duty of Care ............................................................................................... 14

## ARTICLE 4
### INSURANCE AND INDEMNIFICATION

Section 4.1   Manager's Insurance ................................................................................... 14
Section 4.2   Owner's Insurance ...................................................................................... 15
Section 4.3   Hold Harmless and Indemnity .................................................................... 16
Section 4.4   Manager Hold Harmless and Indemnity ..................................................... 17

ARTICLE 5
TAXES, DEBT SERVICE

Section 5.1   Real Property, Ad Valorem Or Other Taxes........................................................ 17
Section 5.2   Sales and Use Taxes........................................................................................... 17
Section 5.3   Debt Service Payments ...................................................................................... 17

ARTICLE 6
MANAGER'S COMPENSATION

Section 6.1   Management Fee.................................................................................................. 17
Section 6.2   Gross Revenues.................................................................................................. 18
Section 6.3   Compensation of Manager for Other Services.................................................... 18

ARTICLE 7
TERM AND TERMINATION

Section 7.1   Term.................................................................................................................... 19
Section 7.2   Termination By Sale ........................................................................................... 19
Section 7.3   Termination By Default ...................................................................................... 19
Section 7.4   Manager Bankruptcy........................................................................................... 20
Section 7.5   Casualty.............................................................................................................. 20
Section 7.6   Condemnation ..................................................................................................... 20
Section 7.7   No Cause ............................................................................................................ 20
Section 7.8   Manager's Obligations After Termination........................................................... 20
Section 7.9   Final Accounting................................................................................................. 20

ARTICLE 8
NOTICES AND ASSIGNMENTS

Section 8.1   Notice.................................................................................................................. 21
Section 8.2   Permitted Assignment ......................................................................................... 22

ARTICLE 9
MISCELLANEOUS

Section 9.1    Delegation of Responsibility for Operational Activities ...................................... 22
Section 9.2    Conflicts of Interest............................................................................................. 22
Section 9.3    Non-Solicitation.................................................................................................. 22
Section 9.4    Signs.................................................................................................................... 23
Section 9.5    Pronouns ............................................................................................................. 23
Section 9.6    Amendments ....................................................................................................... 23
Section 9.7    Headings ............................................................................................................. 23
Section 9.8    Representations.................................................................................................... 23
Section 9.9    Complete Agreement .......................................................................................... 23
Section 9.10   Governing Law ................................................................................................... 23
Section 9.11   Attorney's Fees................................................................................................... 23
Section 9.12   Waiver of Jury Trial ........................................................................................... 23
Section 9.13   Force Majeure ..................................................................................................... 24
Section 9.14   OFAC.................................................................................................................. 24

Section 9.15   Additional Premises ........................................................................................... 24
Section 9.16   Owner Collective Liability ................................................................................ 24
Section 9.17   Sale of Parcel .................................................................................................... 24
Section 9.18   Designation of Owner's Agent .......................................................................... 25

**EXHIBITS**

Exhibit A      DESCRIPTION OF REAL PROPERTY
Exhibit B      REPORTS
Exhibit C      EMPLOYEE COSTS
Exhibit D      MANAGEMENT OFFICE COSTS
Exhibit E      SOFTWARE REQUIREMENTS
Exhibit F      CONSTRUCTION MANAGEMENT FEE

Trammell Crow Company

## LIST OF DEFINED TERMS

Agreement .................................................................................................................. 1
Approved Capital Budget .......................................................................................... 4
Approved Operating Budget ..................................................................................... 4
Budgets ..................................................................................................................... 4
Capital Budget ......................................................................................................... 4
Chart of Accounts .................................................................................................... 3
Claims ..................................................................................................................... 15
Commencement Date................................................................................................. 1
Construction Management Fee ................................................................................ 18
Financial Reports ..................................................................................................... 3
Gross Revenues....................................................................................................... 17
Hazardous Activity .................................................................................................. 9
Hazardous Materials ............................................................................................... 10
Intragroup Merger ................................................................................................... 21
Management Fee ...................................................................................................... 17
Management Office Costs ....................................................................................... 12
Manager .................................................................................................................... 1
OFAC....................................................................................................................... 23
Operating Account .................................................................................................... 5
Operating Budget ...................................................................................................... 4
Operational Activities ............................................................................................... 2
Owner ....................................................................................................................... 1
Premises .................................................................................................................... 1
Renewal Term ......................................................................................................... 18
Security Deposits ...................................................................................................... 5
Software Requirements ............................................................................................ 3
Term ........................................................................................................................ 18

Trammell Crow Company

## PROPERTY MANAGEMENT AGREEMENT

This Property Management Agreement (this "**Agreement**") is made as of August 14, 2006, by and among Hunting Fox Associates I, L.P., a Pennsylvania limited partnership, Hunting Fox Associates III, L.P., a Pennsylvania limited partnership, Hunting Fox Associates IV, L.P., a Pennsylvania limited partnership, Hunting Fox Associates V, L.P., a Pennsylvania limited partnership, Hunting Fox TCI III, L.P., a Pennsylvania limited partnership, Hunting Fox TCI IV, L.P., a Pennsylvania limited partnership, (hereinafter referred to, individually and collectively as the context may require, as "**Owner**", (hereinafter referred to as "**Owner**") and **TRAMMELL CROW SERVICES, INC.**, a Delaware corporation (hereinafter referred to as "**Manager**").

### RECITALS:

Owner, either individually or collectively with one or more other Owners, owns the parcels described on <u>Exhibit A</u> to this Agreement, the improvements and fixtures thereon, and all appurtenances thereto (each individual parcel of land, with such improvements, fixtures and appurtenances and any personal property of Owner on said land or in such improvements being herein called a "**Parcel**", with all Parcels collectively constituting the "**Premises**"), being a(n) Office/Industrial facility located at 2450 Hunting Park Avenue, Philadelphia, PA  19129, containing approximately 2,150,000 rentable square feet, and commonly known as Budd Commerce Center.  Owner desires to engage Manager as its exclusive property manager for the Premises to manage and operate the Premises, and Manager desires to accept such engagement.

### WITNESSETH:

In consideration of the covenants herein contained, the parties hereto agree as follows:

### ARTICLE 1
### APPOINTMENT AND AUTHORITY OF MANAGER

In consideration of the mutual promises made by Owner and Manager in this Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager agree as follows:

**Section 1.1     Appointment.**     Owner hereby appoints Manager as the exclusive managing agent for the Premises.  Owner hereby authorizes Manager to exercise such powers with respect to the Premises as may be appropriate for the performance of Manager's obligations under the terms of this Agreement and Manager accepts such appointment under the terms and conditions hereinafter set forth.  Manager shall have no right or authority, expressed or implied, to commit or otherwise obligate Owner in any manner whatsoever except to the extent provided herein.

**Section 1.2     Commencement Date**.  Manager's duties and responsibilities under this Agreement shall begin on August 14, 2006 (the "**Commencement Date**"), and shall continue until the expiration or earlier termination of this Agreement as provided herein.

## ARTICLE 2
## MANAGER'S AGREEMENTS

**Section 2.1    General Responsibility.** Manager, on behalf of Owner, shall implement, or cause to be implemented, the decisions of Owner with respect to the Premises and shall supervise and direct the management and operation of the Premises on behalf of Owner as provided in this Agreement   (the "**Operational Activities**").    Manager agrees to use commercially reasonable efforts in its conduct of the Operational Activities and to comply with such instructions and policies as may be required by Owner; provided that in no event shall Manager be required to comply with any instructions or policies which would cause a violation of law or governmental requirements.

**Section 2.2    Independent Contractor.** Manager covenants and agrees to perform the Operational Activities and Owner authorizes Manager to perform the Operational Activities on behalf of Owner.   Manager, in the performance of its duties under this Agreement, is an independent contractor and it is expressly understood and agreed that payments hereunder shall be payments by Owner to Manager as an independent contractor and not as an agent, employee, partner or joint venturer of Owner.  Nothing in this Agreement shall be construed as requiring Manager to bear any portion of any losses or gains arising out of or connected with the ownership or operation of the Premises.

**Section 2.3    Subordination and Attornment.**  If required by any Lender providing financing to Owner for the Premises, and subject to reasonable approval by Manager, Manager agrees to execute and deliver a subordination and attornment agreement in favor of such lender within fifteen (15) business days of request by Owner.  The form of such subordination and attornment agreement shall be such Lender's standard form and reasonably acceptable to Manager.

## ARTICLE 3
## SERVICES OF MANAGER

**Section 3.1    For Owner's Account.**  The services of Manager in performing its duties and providing services pursuant to this Agreement shall be for the account of Owner.  Owner agrees to be responsible for all costs, expenses, and disbursements incurred by Manager under the terms of this Agreement in conducting the Operational Activities, such as, but not limited to: contracts for cleaning and janitorial service, landscaping, maintenance services, supplies and equipment, employee costs, and other costs directly related to the management and operations of the Premises. Manager will not incur any expenses or make any expenditure except as expressly permitted in or by this Agreement.   Under no circumstances shall Manager be required to advance funds from its own accounts for the operation, maintenance, repair or management of the Premises.  Owner shall be responsible for full compliance with all applicable federal, state and municipal laws, ordinances, regulations and orders relating to the use, operation, repair and maintenance of the Premises and with the rules, regulations and orders of the local Board of Fire Underwriters or other similar body, if any; provided that Manager shall be liable for such violations to the extent such liability arises from Manager's failure to perform its obligations under this Agreement in a timely manner and further provided that Owner has provided adequate funds to allow Manager to perform such obligations.

TrammellCrowCompany

**Section 3.2    Standards**.  Subject to budgetary limitations, Manager shall manage, operate, and maintain the Premises in a manner normally associated with the prudent management and operation of a project of similar quality which shall include maintaining the Premises in a clean, safe, operable, and attractive condition comparable to similar projects in the area and otherwise in accordance with industry standards, unless otherwise directed by Owner.

**Section 3.3    Computer Software**.  At Owner's cost, Manager shall utilize the software system(s) (and if required to run the software, the specialized hardware, connectivity, service and support requirements necessary for such software), as more particularly set forth on Exhibit E attached hereto  (the "**Software Requirements**").  Owner agrees to provide and pay for all annual licensing agreement fees and training for Manager's employees (including travel costs) related to Manager's adoption of the Software Requirements.  In the event Manager manages one (1) or more properties for Owner or its affiliates, all such software costs shall be equitably allocated to each property to minimize the need for duplicate software costs.

**Section 3.4    Financial Reports and Records**.  Manager shall maintain separate books and records for the Premises as provided by its property management system and as may otherwise be required by Owner, subject to review of the requirement and to the extent such requirement falls outside of the scope contemplated herein, subject to an agreement for the funding of such request, which shall be supported by proper documentation.  Manager shall retain such books and records for such time as is prescribed by Manager's document retention policy or as otherwise required by applicable law.  All accounting for the Premises shall be in accordance with accrual basis accounting principles consistently applied.  Manager shall implement appropriate controls over accounting and financial transactions as is reasonably required to protect Owner's assets from theft, error or fraudulent activity.  Upon termination of this Agreement for any reason, Manager shall promptly send a copy of all books and records to Owner, which obligation shall survive any transaction hereof.

(a)    Manager shall provide a standard chart of accounts (the "**Chart of Accounts**") from its property management system for all income and expense categories generated by all operational activities at the Premises.

(b)    Manager shall furnish Owner with the financial reports set forth in Exhibit B (the "**Financial Reports**").  The Financial Reports will be in electronic format and will be delivered to Owner no later than the twentieth (20th) day of the month or by the applicable date(s) set forth in Exhibit B for the specific report.

(c)    Manager may provide, at Owner's cost and expense, such special "customized" reports as Owner may otherwise reasonably request in writing from Manager and which are not set forth on Exhibit B.  Upon receipt of Owner's request for a customized report that is not contemplated by Exhibit B, Manager shall deliver a written proposal showing the format of the report and the cost to produce such report; provided, Manager shall not be responsible for the preparation of any forms, reports, invoices or tax returns required to be filed or prepared on behalf of Owner in connection with the Premises by any local, state, federal or other governmental authority, except that Manager shall provide Owner with customary system generated worksheets required by the respective tax forms.

(d)    Owner or its representatives may conduct examinations, during normal business hours and upon reasonable prior notice, of the books and records maintained for Owner by Manager. Owner also may perform any and all additional audit tests relating to Manager's activities, either at the Premises or at the office of Manager; provided such audit tests are directly related to those activities performed by Manager for Owner and do not unduly interfere with the performance of Manager's duties under this Agreement. Any and all such audits shall be at the sole expense of Owner. Should Owner discover either weaknesses in internal controls or errors in record keeping, Manager shall correct discrepancies either upon discovery or within a reasonable period of time after the audit, but in no event to exceed forty-five (45) days. Notwithstanding anything herein to the contrary, in the event Owner's audit reveals discrepancies equal to the greater of (i) six percent (6%) or more in the aggregate or (ii) $2,500, then Manager shall reimburse Owner for the cost of such audit, up to a maximum amount of $2,500.

**Section 3.5    Budgets.**    Manager shall for each calendar year prepare and submit to Owner a proposed operating budget (the "**Operating Budget**") and a proposed five-year on-going capital improvements budget (the "**Capital Budget**", and each of the Capital Budget and Operating Budget, a "**Budget**," and collectively the "**Budgets**") for, respectively, the (i) management and operation of the Premises and (ii) the replacement, repair, and maintenance of equipment or improvements of a capital nature on or about the Premises. Each proposed Budget for the succeeding calendar year shall be presented to Owner no later than November 1 of the preceding calendar year. Owner shall provide Manager with the 2006 calendar year budgets which will be used for the balance of the calendar year.

(a)    If the proposed Budgets are acceptable to Owner, Owner shall so notify Manager within forty-five (45) days after Owner's receipt of the Budgets. Should Owner fail to notify Manager within sixty (60) days of receipt of the Budgets, following at least five (5) days after Owner's receipt of a notice from Manager that the 45-day approval period has elapsed, then the proposed Operating Budget (but not the Capital Budget) will be deemed accepted by Owner. The proposed Operating Budget when approved or deemed approved, shall then become the approved Operating Budget (the "**Approved Operating Budget**") for purposes of this Agreement. The Capital Budget shall not at any time be deemed approved unless and until Owner shall have approved the same in writing.

(b)    The Approved Operating Budget shall constitute an authorization for Manager to expend such funds as are appropriate to manage and operate the Premises. Any such authorization to expend money shall be limited to the allocations specifically set forth in the Approved Operating Budget, except as set forth below.

(1)    Any contemplated expenditure that will result in a cumulative excess of:  (A) five percent (5%) of the year-to-date (YTD) budgeted expenses, or, (B) ten percent (10%) in any one of the major operating categories comprising the Budget, and (C) exceeding Two Thousand Five Hundred Dollars ($2,500), shall require the prior written approval of Owner. Manager shall notify Owner in writing of the variance and Owner shall approve or disapprove the expenditure in writing within seven (7) business days of receipt of Manager's notification.

Trammell Crow Company

(2)     The Capital Budget, when approved, shall then become the approved capital budget ("**Approved Capital Budget**") and shall constitute an authorization for Manager to expend such funds as are appropriate to implement the items called for in such budget for the Premises.  Any such authorization to expend money shall be limited to the allocations specifically set forth in the Approved Capital Budget.  All expenditures for capital improvements not included in the Approved Capital Budget or in excess of any budget item therein shall require Owner's prior approval, which approval shall be requested by Manager at least thirty (30) days prior to the expenditure for any capital improvements.  Owner shall, at all times, have the right to review and approve all bids for capital improvements.

**Section 3.6     Bank Account.**  At Owner's expense, Manager shall open and maintain bank accounts (including lockbox arrangements if required by Owner) in such bank, or banks, recommended by Manager and approved by Owner, in Owner's name and under Owner's tax identification number.  Manager, Owner and any other persons designated by Owner in writing to Manager acting individually, shall be an authorized signatory on all such accounts.  At all times, the funds deposited in such account (or accounts) shall be the sole and exclusive property of Owner and shall not be commingled with the funds of any third party.  Owner shall be solely responsible for all fees charged by the bank or banks maintaining such accounts.  In the event Owner is required to maintain a lockbox in connection with any financing for the Premises, Manager agrees to abide by the terms of any such Lender's requirements for such lockbox, provided the same are provided to Manager in writing, and provided further that if Manager cannot reasonably comply with such terms, then this Agreement shall automatically terminate.

(a)     **Operating Account.**

(1)     Subject to any Cash Management Agreements (or other similar agreements) between Owner and a Lender for the Premises, which agreements shall be provided in advance to Manager,  Manager shall deposit into an account all rents and any other funds collected from operational activities of the Premises (the "**Operating Account**").  Out of the Operating Account, Manager shall pay the operating expenses of the Premises and all other payments relative to the Premises as required or permitted pursuant to the terms of this Agreement.  All tenant security deposits (the "**Security Deposits**") shall be deposited to the Operating Account, or, if required by applicable law or at the direction of Owner, segregated to a separate account.

(2)     Manager shall maintain records of all Security Deposits.  Should it become necessary to refund all, or part, of a security deposit to a lessee, Manager shall advise Owner, in writing, that such amount is to be withdrawn, or, if the applicable account does not contain adequate funds, then Owner shall replenish the amounts necessary to refund such security deposits at the appropriate time.

(3)     Owner shall initially fund and thereafter maintain the Operating Account with a balance reasonably determined by Owner and Manager to be sufficient to pay the estimated operating expenses set forth in the Approved Operating Budget.  After Manager has paid, to the extent of available cash in the Operating Account, those expenses for which sufficient funds are available in the Operating Account, Manager

shall submit to Owner a statement of all remaining unpaid bills. Owner shall endeavor to maintain a minimum balance sufficient to cover one (1) month of the estimated operational expenses in the Operating Account at all times during the term of this Agreement, provided that in no event shall Manager have any liability for any delinquent accounts caused by insufficient funds in the Operating Account. All cash not otherwise reserved or required herein pursuant to the Approved Operating Budget and Approved Capital Budget (or any cash dedicated to special expense items subsequently agreed upon by Manager and Owner) shall be remitted to Owner on a monthly basis, unless otherwise directed by Owner. Owner shall indemnify Manager for any out-of-pocket costs or expenses incurred by Manager as a result of insufficient funds in the Operating Account.

(4)     Thereafter, upon receipt of Manager's monthly statement of receipts and disbursements and request for funding, if necessary, Owner shall deposit into the Operating Account an amount sufficient to pay the estimated operating and capital expenses for the immediately following month (as set forth in the Budgets).

(5)     From time to time Manager may request that Owner deposit additional funds to the Operating Account, and such request shall be accompanied by an explanation of those expenses which necessitate the additional deposit.

(6)     Manager is authorized to draw on the Operating Account on behalf of and in the name of Owner, as and when required in connection with its conduct of the Operational Activities. Manager shall pay from the Operating Account all expenses to the Premises properly incurred by Manager in the performance of its duties hereunder and/or pursuant to this Agreement and set forth in the Approved Operating Budget and/or approved Capital Budget including, but not limited to, the following expenses:

(A)     With the prior written consent of Owner, cost to correct any violation of federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operating, repair and maintenance of the Premises, or relative to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body.

(B)     Actual and reasonable cost of making all repairs, replacements, additions, decorations and alterations to the Premises properly incurred by Manager pursuant to this Agreement.

(C)     Costs incurred by Manager in connection with all service agreements entered into pursuant to this Agreement.

(D)     Cost of collection of delinquent rentals collected through a collection agency provided that Owner has authorized Manager to pursue such collection.

(E)     Preapproved and authorized attorney's fees and costs in connection with any tenant receivables provided Owner has preauthorized Manager to act on its behalf.

(F)    Cost of those OFAC (defined below) current searches conducted at Owner's written request and on behalf of Owner for the purpose of screening prospective tenants.

(G)    Cost of capital expenditures made pursuant to the Approved Capital Budget or as otherwise directed by Owner.

(H)    Cost of printed checks for each bank account required by Owner and cost of printed forms and supplies required for use at the Premises; provided that such costs may be properly chargeable to the Premises.

(I)    Administrative costs including postage, overnight delivery services, messenger services and copying services.

(J)    Vehicle expenses for motor vehicles owned by Owner or for those vehicle costs incurred in connection with management of the Property.

(K)    Provided Owner has consented in writing, cost of all tenant relation and marketing event expenses, including advertising and promotional materials, sporting event tickets and special events for tenants of the Premises.

(L)    All compensation payable to Manager pursuant to this Agreement.

(M)    Utility costs.

(N)    Costs to maintain the insurance required under this Agreement and associated charges.

(O)    All direct and indirect costs associated with Manager's fully or partially dedicated personnel and the cost of any on-site management office, as more particularly set forth in Section 3.7(c) and Section 3.14.

(P)    Reasonable travel and training expenses directly related to the Operational Activities (but not expenses incurred by Manager's employees relating to their commutes from their residences to the Premises).

(Q)    Cost of all engineering supplies and equipment necessary to carry out the Operational Activities, including, but not limited to, boots, uniforms and radios.

(R)    Cost of all portable communications equipment (including connectivity costs) allocable to the Operational Activities, including mobile phones, pagers, portable e-mail devices, and personal digital assistants.

(S)    Cost of all software, licenses, hardware and personnel training associated with Owner's request that Manager adopt Owner's specialized software systems.

TrammellCrowCompany

(T)     Real property, ad valorem and other tax payments made pursuant to Section 5.1 and Section 5.2.

(U)     Debt service payments as more particularly set forth in Section 5.3.

(V)     Any specific, non-recurring charges approved by Owner.

(W)     An asset management fee in an amount agreed to by the parties payable to Preferred Real Estate Investments, Inc. and/or an affiliate thereof.

(b)     **Monthly Cash Reconciliation**.

(1)     Manager shall not be obligated to make any advance to or for the account of Owner or to pay any sums except out of funds in the Operating Account, nor shall Manager be obliged to incur any liability or undertake any obligation for the account of Owner.

(2)     If at any time the cash available for withdrawal from the Operating Account is insufficient to pay expenses incurred with respect to the Operational Activities, Manager shall notify Owner promptly upon becoming aware of such deficiency.

(3)     Manager shall deliver to Owner a monthly bank reconciliation for the Operating Account.

(c)     **Disbursement Account**.   In addition to the Operating Account, Owner authorizes Manager to maintain a common disbursement account for Owner and its affiliates from which operating and other expenses of the Premises set forth in an Approved Operating Budget and the other premises of its affiliates (the "**Disbursement Account**") may be paid. The disbursements from the Disbursement Account relating to the Owner or the Premises may only be funded with funds from the Operating Account of Owner. Any deposit of funds from the Operating Account to the Disbursement Account shall be precisely the amount of each obligation being paid, and Manager shall maintain an accounting entry on the Disbursement Account ledger evidencing the source of each deposit and the debit(s) in the same amount for the benefit of Owner. The Disbursement Account shall be titled "Trammell Crow Services, Inc., as Agent For Preferred Asset Management, LLC". Preferred Asset Management, LLC is the asset manager and an affiliate of Owner.

**Section 3.7     Employees**.   Manager shall have in its employ at all times a sufficient number of capable employees to properly, safely, and economically carry-out the Operational Activities as set forth on the Operating Budget.  All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees are the sole responsibility of Manager and shall not be employees of Owner.  Manager shall use reasonable care in the screening, selection and supervision of all employees.

Trammell Crow Company

(a) **Insurance**. Manager shall fully comply with all applicable laws and regulations pertaining to worker's compensation insurance, social security insurance, unemployment insurance, hours of labor, wages, working conditions (to the extent the same are reasonably under Manager's control), and other employer-employee related subjects. Manager represents that it is and will continue to be an Equal Opportunity Employer.

(b) **Employees of Manager**. All persons employed at the expense of Owner in connection with the Operational Activities shall be employees of Manager, consultants or independent contractors retained by Manager. Except as provided in this Agreement, Owner shall have no liability to Manager for any labor and employment decisions affecting any employee or former employee of Manager, which shall be the sole responsibility of Manager. Except for those employee costs for which Owner has agreed to reimburse Manager, Manager shall indemnify and defend Owner from and against any Claims (as defined below) brought against or incurred by Owner to the extent caused by, relating to, based upon, arising out of, or in connection with the employment and/or termination of employment of any Manager employee. This indemnification obligation shall extend to the officers, directors, employees, representatives, agents and affiliates of Owner.

(c) **Manager's Employee Costs Reimbursed**. After initial payment by Manager, Owner shall reimburse Manager for all employee salaries, benefits (including, without limitation, workers compensation insurance costs) and bonuses for those fully or partially dedicated employees of Manager, all of which shall be part of the Approved Operating Budget, and for which initial estimates are set forth on Exhibit C of this Agreement. Benefits charges shall initially be fixed at 36% of the base salary and bonus of each employee. The levels of employee compensation and benefits (and the maximum levels of any bonuses) shall not exceed the amounts for the individual, corresponding employee positions set forth in the Approved Operating Budget. Such employee compensation, including benefits, may be increased annually to reflect actual cost of living increases and individual merit raises, all as may be approved by Owner in the Operating Budget. Salaries, bonuses and benefits shall be reimbursed monthly or as otherwise paid by Manager.

**Section 3.8** **Collection of Rents and Other Income**. Manager shall use commercially reasonable efforts to collect all rents and other charges which may become due from any tenant or from others for services provided in connection with the use of the Premises. Manager shall identify and collect any income due Owner for miscellaneous services provided to tenants or to the general public. All sums so collected shall be deposited in the Operating Account. Manager shall not write off any income items greater than two dollars without the prior approval of Owner.

**Section 3.9** **Maintenance, Repairs, Alterations**. Manager shall initiate and supervise all ordinary and extraordinary repairs, decorations and alterations on or about the Premises, including (i) repairs or alterations which Owner is required to make pursuant to the terms of tenant leases and (ii) the administration of a preventative maintenance program for all mechanical, electrical and plumbing systems and equipment for which tenants are not solely responsible.

Trammell Crow Company

(a) **Operations and Maintenance.** Manager shall undertake and supervise all operational activities of the Premises for which tenants are not solely responsible such as, but not limited to: janitorial and cleaning work, window washing, metal and marble maintenance; security of the Premises; landscaping; operation of HVAC and electrical equipment; a preventative maintenance program; and any other maintenance or repair activity to ensure operation of a quality project for Owner and the tenants. Subject to Owner's payment thereof, Manager shall also perform Owner's obligations with respect to the operation and maintenance of the Premises under any mortgage encumbering the Premises; provided Owner gives Manager written notice of such mortgage obligations.

(b) **Emergency Repair and Approved Repair Cost**: With respect to any expense not itemized in the Approved Operating Budget, no single expenditure for any repair shall exceed Two Thousand Five Hundred Dollars ($2,500.00) without the prior written approval of Owner, with the exception of emergencies relating to life support systems, building safety or other emergencies threatening damage to persons or to the Premises. Manager may make such emergency repairs as are necessary or advisable, at Owner's expense, and shall take all commercially reasonable efforts to immediately notify Owner of an emergency event, the nature of the remedy implemented by Manager, and to the extent such information is available, the cost of implementing such remedy. Actual expenses for materials and labor for such purposes will be paid for from the Operating Account or by Owner.

(c) **Hazardous Materials; Violations of Law; Governmental Notices**: Owner shall provide or otherwise make available to Manager all material environmental reports in Owner's possession or from its consultants. Owner acknowledges that Manager is not an environmental expert or consultant in the field of Hazardous Materials. Therefore, with respect to any significant environmental conditions or issues pertaining to Hazardous Materials at the Premises, Owner agrees and acknowledges that Manager and its agents, officers, directors, partners, shareholders and employees are not and shall not be deemed "operators" of such facility or any tenant operations therein or thereon or "generators" or "transporters" (or have any comparable legal status) for purposes of current or pending federal, state or local laws pertaining to Hazardous Materials. Accordingly, notwithstanding any provision hereof to the contrary, with respect to any Hazardous Materials that may be present below, on, under, in, about or otherwise affecting the Premises, Manager shall not be responsible for detecting, handling, removing, remediating or otherwise determining how to deal with such Hazardous Materials, and Manager shall not in any way be responsible for the storage, transportation, disposal, abatement, cleanup or removal of, or other dealings with, Hazardous Materials (each a "**Hazardous Activity**"), except for those Hazardous Materials, if any, used by Manager in the ordinary course of conducting the Operational Activities.

(1) **Other Pre-Existing Conditions and Defects.** In addition to the foregoing, Manager shall not be responsible for detecting or dealing with any pre-existing conditions of the Premises that may adversely affect the operations, maintenance or use of such facility or the health or safety of persons or property. Furthermore, Manager shall not be responsible for detecting or dealing with structural or latent defects or other defects in the design or construction of the Premises. Owner shall indemnify, defend and hold Manager harmless from and against all Claims (defined below) asserted against or incurred by Manager to the extent such Claims result from or arise out of any condition

Trammell Crow Company

or circumstance arising initially prior to the date of this Agreement (regardless of whether such condition or circumstance continues) or that otherwise is not a matter for which Manager has specifically agreed to indemnify Owner pursuant to Section 4.3. The foregoing obligation to indemnify, defend and hold harmless Manager shall apply regardless of the extent to which the corresponding costs, expenses and liabilities otherwise are covered and paid by the insurance required to be carried by Owner or Manager under this Agreement and shall survive the expiration of the Term or termination of this Agreement.

(2)    **Hazardous Activities**. Manager and Owner acknowledge that, from time to time, there may be Hazardous Materials that Manager is requested by Owner to clean up, dispose of, remove or otherwise handle or deal with in some fashion, including materials or substances that are not suspected to be Hazardous Materials but in fact are Hazardous Materials. If so requested by Owner, Manager may elect to engage in a Hazardous Activity or refuse to do so in its sole discretion. Furthermore, if Manager elects to engage in any Hazardous Activity, it may at any time cease the performance of such Hazardous Activity, provided that Manager shall cooperate with Owner in a commercially reasonable manner to provide for a transition to another service provider. Neither the refusal to engage in a Hazardous Activity nor the termination of a Hazardous Activity previously commenced shall be deemed in any way to be a default or breach under this Agreement or otherwise subject Manager to penalty or liability.

(3)    **Hazardous Materials Defined**. As used herein, "**Hazardous Materials**" shall mean any hazardous material or substance which is or becomes defined as a "hazardous waste," "hazardous substance," "hazardous material," pollutant, or contaminant under any federal, state or local statute, regulation, rule or ordinance or amendments thereto including, without limitation, the comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601) as amended, and/or the Resource Conservation and Recovery Act (42 U.S.C. § 6901).

**Section 3.10    Capital Expenditures.** The Approved Capital Budget constitutes the authorization for Manager to proceed with obtaining at least three (3) bids for capital improvements covered by the Approved Capital Budget. With respect to bids contemplating expenditures in excess of Two Thousand Five Hundred Dollars ($2,500.00) Manager shall obtain the prior written approval of Owner prior to the awarding of any such contract. With respect to the purchase and installation of major items of new or replacement equipment and/or materials, when the cost exceeds Two Thousand Five Hundred Dollars ($2,500.00) for any one item not included in the Approved Capital Budget, Manager shall recommend to Owner the purchase of such items when Manager believes the same to be necessary or desirable and shall obtain Owner's approval prior to purchasing such items. Owner may pay for capital expenses from its own resources or may authorize payment by Manager out of the Operating Account.

**Section 3.11    Service Contracts.** Manager shall arrange on behalf of Owner for the cleaning, maintenance and services needed by the Premises, but shall not enter into any contract or obligation in connection with the management, operation, and maintenance of the Premises that is not included in the Approved Operating Budget without the prior written authorization of Owner (except as otherwise provided in this Agreement). As a condition to obtaining

authorization, Manager shall supply Owner with a copy of the proposed contract and shall state to Owner the relationship, if any, between Manager and the party proposed to supply such goods and/or services. If any bid is from a related party, such bid must be accompanied by two (2) independent bids for the same work. Each such service contract entered into by Manager shall not extend for more than one year, and shall include a provision of cancellation thereof for any reason upon not more than thirty (30) days written notice and without payment of any cancellation fee, unless otherwise approved in writing by Owner, and shall require that all contractors provide evidence of sufficient insurance and shall be assignable by Owner without consent. All service contracts are entered into by Manager, as Owner's agent (for this limited purpose, only), for the account and in the name of Owner and the funds necessary to pay for the services so obtained shall be paid from the Operating Account with funds advanced by Owner.

**Section 3.12  Compliance With Laws.** (Subject to the provisions of Section 3.9(c), Manager shall, at Owner's expense, use commercially reasonable efforts to cause the operation of the Premises to comply with any and all laws, ordinances, rules and regulations affecting the Premises. Manager shall immediately notify Owner of any known violation of any federal, state or municipal or other governmental law, ordinance, rule or regulation due to the structure or condition of the Premises or the use made thereof by any tenant, occupant or employee. If the expense of remedying any such violation is less than Two Thousand Five Hundred Dollars ($2,500.00), Manager may (but shall have no obligation to) remedy such violation and the expenses thereof shall be paid from the Operating Account. If the expense of remedying such violation exceeds such amount, Manager shall not take any action with respect to such violation except to notify Owner and await Owner's written instructions, unless relating to an emergency, building safety or other emergency potentially threatening damage to persons or the Premises. Manager shall not, in performance of its services hereunder, knowingly violate, and shall comply in all material respects with the terms of, any ground lease, space lease, mortgage, deed of trust or other security instrument binding on or affecting any of the Premises, provided that true and complete copies of such documents have been delivered to Manager or Owner has otherwise disclosed such terms to Manager in writing. If a conflict arises between the terms of any such document and the terms of this Agreement, Manager shall not take any action except to notify Owner and await Owner's written instructions. Manager shall not be required to make any payment or incur any liability in order to comply with any such terms or conditions of any such instruments.

**Section 3.13  Notification of Litigation.** If Manager is notified of any claim, demand, suit or other legal proceeding made or instituted against Owner on account of any matter connected with the Premises, Manager shall give Owner all information in its possession pertaining to such matter, and shall assist and cooperate with Owner, at Owner's expense, in all reasonable respects in the defense of any such suit or other legal proceeding.

**Section 3.14  Management Office.** Subject to Owner's prior written approval, at all times during the Term (and any Renewal Term), Owner shall provide to Manager, at Owner's sole cost and expense, (i) an on-site office, together with necessary furniture, fixtures and equipment, (including printers, copiers, phones and fax machines) at the Premises for Manager's sole use that is suitable for the conduct of Manager's duties hereunder, and (ii) sufficient computer systems for the conduct of Manager's duties hereunder. In addition, Owner shall, at Owners' sole cost and expense, provide technical support services and such connections as are

necessary to allow Manager to access Manager's central corporate server. The initial cost of the on-site furniture, fixtures, equipment and services to be provided to Manager pursuant in the this section ("**Management Office Costs**") is set forth in <u>Exhibit D</u> attached hereto. If the on-site office and services are used by Manager to service other properties of Owner (or an affiliate of Owner), the Management Office Costs will be allocated among the Premises and such other properties in a manner reasonably satisfactory to Owner and Manager. Upon reasonable advance notice to Manager, Owner may relocate the on-site office from time to time to space of comparable or greater utility.

**Section 3.15  Business Plan.** If Manager is providing leasing services for the Premises at Owner's direction pursuant to a separate agreement between Owner and Manager, Manager shall provide Owner each year with a draft of a business plan for the Premises, on or before the date specified by Owner, containing such information as Owner may reasonably request, including (i) a list of all properties competitive with the Premises, and other reasonably available information respecting each, and (ii) basic demographic data relating to the market area of the Premises, including population growth, major employers, employment and unemployment levels and, if the Premises is a retail property, retail sales and housing starts. In the event Manager is not the leasing agent for the Premises, Manager shall use reasonable efforts to coordinate with the leasing agent for the Premises in gathering this data. Notwithstanding anything in this Section to the contrary, Owner has no obligation to enter into any separate leasing agreement with Manager.

**Section 3.16  Contracts with Affiliated Entities.** Manager may, upon prior written notice to Owner, purchase materials, tools or supplies or contract for Operational Activities from a party in which Manager (or any subsidiary, affiliate or related entity) holds a beneficial interest provided that the pricing for such materials or services does not exceed the cost of such materials or services commonly charged in the area where the Premises is located and otherwise intrinsically equitable at an arms-length basis.

**Section 3.17  Complaints and Notices.** Manager shall promptly handle complaints and requests from tenants, concessionaires and licensees and notify Owner of any major complaint made by a tenant, concessionaire or licensee. Manager shall notify Owner promptly of: (i) any notice received by Manager or known to Manager of a violation of any governmental requirements (and make recommendations regarding compliance therewith); (ii) any notice received by Manager or known to Manager of violation of covenants, conditions and restrictions affecting the Premises or noncompliance with loan documents affecting the Premises, if any; (iii) any fire, accident or other casualty damage to the Premises known to Manager; (iv) any condemnation proceedings, rezoning or other governmental order, lawsuit or threat thereof involving the Premises known to Manager; (v) any violations relative to the leasing, use, repair and maintenance of the Premises under governmental laws, rules, regulations, ordinances or like provisions known to Manager; (vi) defaults under any leases or other agreements affecting the Premises known to Manager; or (vii) any violation of any insurance requirement known to Manager. Manager shall promptly deliver to Owner copies of any documentation in its possession relating to such matters. Manager shall keep Owner reasonably informed of the status of the particular matter through the final resolution thereof. In the event Manager becomes aware of any fire or other damage to the Premises or has actual knowledge of a violation of applicable law regarding Hazardous Materials at the Premises, Manager shall promptly give

telephonic notice thereof to Owner.  Manager shall complete all necessary and customary loss reports in connection with any fire or other damage to the Premises.  Manager shall retain in the records it maintains for the Premises copies of all supporting documentation with reference to such notices.

**Section 3.18   Duty of Care**.  Manager shall exercise such control over accounting and financial transactions as is reasonable for a prudent property management company to protect against recklessness, willful misconduct, fraud or criminal acts on the part of Manager or its agents, associates or employees.

**ARTICLE 4**
**INSURANCE AND INDEMNIFICATION**

**Section 4.1   Manager's Insurance.**  Manager shall, at Owner's expense, secure and maintain with one or more insurance companies reasonably satisfactory to Owner, the following insurance:

(a)   Workers Compensation Insurance – to protect your employees for the Statutory Requirements of the state(s) involved including coverage under any applicable federal laws (U.S. Longshoremen and Harbor Workers Act, Jones Act, etc.)

(b)   Employers Liability   $500,000 Each Accident – Bodily Injury
$500,000 Each Employee – Bodily Injury by Disease
$500,000 Policy Limit – Bodily Injury by Disease

(c)   Commercial General Liability (7/98 or its equivalent):  Occurrence Form including Premises & Operations, Independence Contractors, Products, Completed Operations (for at least five years after completion of project), Explosion, Collapse & Underground (XCU) Hazards, Broad Form Contractual Liability, Personal Injury, Broad Form Property Damage including Completed Operations, and Blanket Additional Insured Endorsement.

(1)   Limits of Liability:

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Products & Completed Operations Aggregate | $2,000,000 |
| Personal & Advertising Injury | $1,000,000 |
| Each Occurrence | $1,000,000 |
| Fire Damage (Any One Fire) | $50,000 |
| Medical Expenses (Any One Person) | $10,000 |

(2)   The Personal & Advertising Injury Liability coverage afforded by this policy shall have the exclusion pertaining to Contractual Liability deleted; the certificate of insurance shall state as such.

(d)   Comprehensive Automobile Liability – covering all Owned, Hired and Non Owned vehicles for limited of $1,000,000 Combined Single Limit – Bodily Injury and Property Damage Liability.

Trammell Crow Company

(e)  Umbrella Liability -  $5,000,000 each occurrence
$5,000,000 aggregate

No Cross Suits Exclusion is to apply to this policy.

(f)  Property Insurance – on an "All Risks" basis covering any Business Personal Property, Computer Equipment or other materials used by the Manager and located at Managed Properties of the Owner(s).

(g)  Errors & Omissions Insurance (Professional Liability, if applicable) – a Professional Liability policy with a limit of $1,000,000 Each Occurrence, $1,000,000 Aggregate is required.  If coverage is afforded on a Claims Made basis, a minimum tail of three (3) years must be purchased.

All coverage shall be in a form acceptable to Owner.  The above policies (except Workers' Compensation & Professional Liability) must also name the Owner and any and all subsidiaries as Additional Insureds.  In addition, all carriers must be rated by A.M. Best Company as "A X" or better and be admitted to conduct insurance business in Pennsylvania.

A Waiver of Subrogation is required and must be provided in favor of the Owner and any and all subsidiaries with respect to the General Liability, Automobile, Workers Compensation, Professional Liability and Umbrella policies.  A guaranteed notice of cancellation by return receipt mail for at least 30 calendar days notice is required.  The certificate of insurance must cross out the following wording with respect to the cancellation wording – "endeavor to" and "failure to mail such notice shall not impose any obligation or liability of any kind upon the company, its agents or representatives."

Manager shall furnish satisfactory evidence of the foregoing insurance to Owner and annual renewals thereof.  Manager shall also require all contractors and subcontractors performing work on, in, or about the Premises to maintain the coverages outlined in this Section 4.1, or such lesser amounts and coverages as Manager reasonably determines to be appropriate consistent with the nature of services provided by the contractor or subcontractor and reasonable and prudent industry standards.

The parties agree that, at any time prior to September 1, 2006, the parties may agree to make mutually acceptable and commercially reasonable changes to this Section.

**Section 4.2**  **Owner's Insurance.**  Owner, at its own expense, will maintain and keep in force insurance complying with the minimum requirements described below:

(a)  Commercial property insurance covering the full replacement cost of the building, fixtures, equipment and improvements and betterments located at the Premises.  Such insurance shall cover the perils insured under the special causes of loss form or other "all risk" form and include flood, earthquake and terrorism perils.

(b)  Loss of rental income, business interruption and extra expense coverage or similar insurance protecting Owner for any lost income due to damage to the Premises.

(c)    Boiler and machinery insurance covering the building, fixtures and equipment located at the Premises for mechanical failure of any property or explosion of pipes or steam boilers.  Such insurance shall include loss of use coverage/business interruption due to these failures.

(d)    Commercial general liability and umbrella coverage with a combined limit of not less than $5,000,000 for each occurrence.

Manager shall be named as an additional insured with respect to Owner's commercial general liability and umbrella policies, and such insurance shall apply as primary insurance with respect to any other insurance available to Owner or Manager.  Such insurance shall insure against losses for damage to the Premises or injury to persons which arise out of the management, operation, occupancy, leasing, or maintenance of the Premises or any activity on the Premises.

Each of Owner and Manager agrees (for themselves and on behalf of their insurers) to waive all rights of recovery and subrogation rights against the other, its agents, servants or employees for any loss or damage which is required to be covered under an insurance policy required to be maintained under this Agreement.  Notification of the existence of this waiver shall be disclosed to each party's insurers, and each of Manager and Owner shall cause such insurers to issue the appropriate endorsement(s) to such policies in order to comply with this paragraph.  This provision shall also apply with respect to any insurance policies presently maintained and substituted hereafter.  Within five business days following the Commencement Date, each of Owner and Manager will provide a certificate of insurance to the other party evidencing all requirements set forth in this Section 4.2.

**Section 4.3    Hold Harmless and Indemnity.**  Owner agrees to defend, indemnify and hold Manager and its agents harmless from any liabilities, claims, demands or legal proceedings (including the costs, expenses and reasonable attorneys' fees incurred in defending such matters, collectively, "**Claims**") arising from the leasing, management and operation of the Premises, except to the extent such liabilities, claims, demands or legal proceedings are caused by, relate to or arise from (i) Manager's material breach of this Agreement, (ii) the grossly negligent acts or willful misconduct of Manager or Manager's agents, employees, or representatives; or (iii) acts or omissions of Manager or Manager's agents, employees or representatives which are outside the scope of services to be rendered by Manager pursuant to this Agreement.

In addition, Owner shall indemnify and hold Manager harmless for failure to pay any charges against the Premises to the extent that necessary funds for such payment are not made available to Manager by Owner upon request therefor by Manager.

This indemnity provision shall survive the termination or expiration of this Agreement.  If any proceeding is filed for which indemnity is required hereunder, Owner agrees, upon request therefor, to defend Manager in such proceeding at its sole cost, utilizing counsel reasonably satisfactory to Manager.  Manager and Owner shall be liable under this Section 4.3 only to the extent of the respective obligations specifically imposed upon them hereunder.  In the event of an occurrence that triggers both Manager's and Owner's indemnification obligations hereunder, each party's liability (including liability for defense costs) shall be equal to the

percentage determined to be due to the unindemnified fault of such party as agreed upon by the parties, as fixed by settlement agreement, as set forth in a final judgment of a court of competent jurisdiction, or as determined by an arbitrator or arbitration panel in an arbitration proceeding, as applicable.

**Section 4.4   Manager Hold Harmless and Indemnity.**  Manager agrees to defend, indemnify and hold the Owner and its affiliates and each of their respective employees, officers, directors and agents harmless from and against any Claims to the extent arising out of (i) any grossly negligent acts or willful misconduct of Manager, its agents or employees; (ii) any failure of Manager to perform, in a commercially reasonable manner, in any material respect any of its obligations under this Agreement, provided such failure was not caused by Owner or by events beyond the reasonable control of Manager, and Owner has furnished to Manager sufficient funds to perform such obligations; or (iii) any acts of Manager beyond the scope of Manager's authority hereunder.  The indemnity in this Section 4.4 shall survive the expiration or termination of this Agreement.

### ARTICLE 5
### TAXES, DEBT SERVICE

**Section 5.1   Real Property, Ad Valorem Or Other Taxes.**  If timely requested by Owner in writing, Manager shall pay, on Owner's behalf, any and all real property, ad valorem or other taxes and assessments, but not state or federal income taxes, levied against any part or all of the Premises.  The cost thereof shall be borne by Owner and, to the extent of available funds, paid by Manager from the Operating Account.  At Owner's request and expense, Manager will retain independent property tax consultants to negotiate property values in an effort to obtain a favorable assessment.

**Section 5.2   Sales and Use Taxes.**  Without limiting the provisions of Section 5.1 above, Owner acknowledges and agrees that it shall be responsible for all sales and use taxes incurred in connection with Manager's performance of the Operational Activities.

**Section 5.3   Debt Service Payments.**  If requested by Owner, Manager shall make any payments on account of any mortgages, deeds of trusts, or other security instruments, if any, affecting the Premises, the cost thereof to be borne by Owner and, to the extent of available funds, paid by Manager from the Operating Account.  Owner will provide Manager copies of all such instruments in effect from time to time so that Manager can make such payments on an accurate and timely basis.

### ARTICLE 6
### MANAGER'S COMPENSATION

**Section 6.1   Management Fee.**  Owner shall pay Manager a monthly management fee in an amount equal to the greater of (a) Three percent (3%) of the monthly Gross Revenues (as defined in Section 6.2) for the preceding month for any month during the term hereof or (b) Six Thousand Dollars ($6,000.00) (the "**Management Fee**").  If the Commencement Date is not on the first day of a calendar month, or if the Term expires (or if this Agreement is terminated) on any day other than the last day of a calendar month, then the Management Fee for such partial

month(s) shall be determined by calculating the Management Fee for the entire month (as though this Agreement were in effect for the entirety of such month) and multiplying it by a fraction, the numerator of which is the number of days during such month that this Agreement was effective, and the denominator of which is the number of days in such month. In addition to the Management Fee, Owner shall pay Manager for the reimbursement of all staff and accounting charges as are defined on Exhibit B attached hereto. The charges listed on such Exhibit may be modified as mutually agreed by the parties within 90 days of the Commencement Date.

### Section 6.2     Gross Revenues.

(a)     For the purposes of computing the Management Fee, "Gross Revenues" shall mean the total collections received from the Premises, including, but not limited to, all rents paid by tenants, including percentage or overage rents, escalations; operating expense pass-through components; utility income; income from the operation of concessions; parking revenues; proceeds from rental interruption or abatement insurance; security deposits applied to the payment of rent after a tenant defaults or applied to a tenant's lease for any rent, and any other income derived from the utilization or operation of the Premises.

(b)     Gross Revenues shall exclude:

(1)     Withdrawals from the Security Deposits on account of damage resulting from tenant misuse of or damage to the Premises.

(2)     Receipts from the sale of assets, settlement of fire losses or liability claims, condemnation proceeds or items of a similar nature.

(3)     Rebates, discounts or other credits received by Manager in connection with purchases of goods, service contracts or other arrangements entered into pursuant to this Agreement for the account of Owner, which items shall accrue solely to the benefit of Owner.

(4)     Security Deposits except as set forth in Section 6.2(a);

(5)     Sums collected or paid for sales, excise or use taxes; and

(6)     Payments for lease cancellations or transactions.

### Section 6.3     Compensation of Manager for Other Services.

(a)     **Construction Management** – If Manager performs construction management services pursuant to Owner's written request, Manager shall receive a construction supervision fee calculated in accordance with Exhibit F hereto (the "**Construction Management Fee**"). Owner acknowledges that Manager's role with respect to any construction conducted at the Premises is managerial in nature and that Manager shall not provide any physical construction services except pursuant to a separate, written agreement. The Construction Management Fee shall be due and payable as contractors are paid for construction activities.

Trammell Crow Company

(b)      **Additional Services** - Manager shall be compensated for Additional Services as follows:

(1)      Owner acknowledges that due diligence work relating to sale or refinancing of the Premises, including generating, reviewing or analyzing accounting or other financial reports, generating or reviewing estoppels and delivery and collection thereof from tenants, compiling copying and transmitting information to prospective purchasers or lenders and settlement sheet preparation and review are outside the scope of this Agreement. Owner shall pay Manager for these services a disposition fee equal to one (1) month's Management Fee together with any severance fees for Owner employees transitioned to Manager, provided that such property disposition is within ninety (90) days of the commencement date of this Agreement, and thereafter no such disposition fee shall be due.

(2)      Hourly billing of the following positions, subject to salary and benefit increases as approved in the annual budget.

| **Position** | **Rate** |
|---|---|
| N/A | |
| | |
| | |

(3)      **Incentive Fee** (describe parameters below).

| | |
|---|---|
| N/A | |
| | |

## ARTICLE 7
## TERM AND TERMINATION

**Section 7.1      Term.**  This Agreement shall commence on the Commencement Date and shall continue for a period ending on August 31, 2007 (the "**Term**") and, unless written notice to the contrary is given by either party hereto not less than thirty (30) days prior to the end of the Term (or any Renewal Term), this Agreement shall automatically be renewed for additional, successive twelve (12) month periods (each a "**Renewal Term**") on its then-existing terms and conditions.

**Section 7.2      Termination By Sale.**  If Owner sells, transfers, or conveys title to all or substantially all of the Premises to a bona-fide, non-related party, either party may terminate this Agreement upon thirty (30) days' prior written notice to the other party, but in any event co-terminus with the date of such sale.

**Section 7.3      Termination By Default.**  Notwithstanding anything to the contrary set forth herein, in the event Owner or Manager shall default with respect to any material covenant,

term or provision of this Agreement, and the same shall not be cured or corrected within thirty (30) days following the receipt of written notice from the non-defaulting party specifying the nature of such default, then the non-defaulting party may terminate this Agreement upon ten (10) days' written notice to the defaulting party.

**Section 7.4    Manager Bankruptcy**.   Owner shall have the right to terminate this Agreement if a petition for bankruptcy, reorganization or rearrangement is filed under any federal or state bankruptcy law or insolvency laws by Manager or if any such petition is filed against Manager and not removed or discharged within sixty (60) days thereafter.

**Section 7.5    Casualty**.   If any building on the Premises is destroyed and Owner, for any reason, elects not to rebuild the building, then this Agreement shall terminate as of the date of notice to Manager that Owner has elected not to rebuild the building after such destruction.

**Section 7.6    Condemnation**.   In the event there is a condemnation of all or any substantial part of the Premises, then this Agreement shall automatically terminate as of the date of such taking.

**Section 7.7    No Cause**.   Owner or Manager may terminate this Agreement without cause at any time by providing the other with ninety (90) days' prior written notice.

**Section 7.8    Manager's Obligations After Termination**.   Upon the termination of this Agreement Manager shall:

(a)    **Deliver Records And Keys**:  Deliver to Owner, or such other person or persons designated by Owner, copies of all books and records pertaining to the Premises and all funds in the possession of Manager belonging to Owner or received by Manager pursuant to the terms of this Agreement (but excluding all fees and expenses paid to Manager pursuant to this Agreement), and all keys or combinations to locks then in Manager's possession. All data files to be delivered to Owner pursuant to this Section shall, to the extent possible, be delivered in electronic format or such other format reasonably required by Owner.

(b)    **Termination of Obligations; Rights to Compensation**:   Upon any termination pursuant to this Article 7, the respective obligations of the parties hereto shall cease as of the date specified in the notice of termination (except for those obligations which, by their terms, survive the expiration or termination of this Agreement); provided, however, that Manager shall be entitled to receive any and all compensation which may be due and owing to Manager hereunder at the time of such termination. Such compensation shall include any fees set forth in Article 6 (whether Management Fees or otherwise) and all expenses reimbursable to Manager pursuant to the terms of this Agreement, each prorated as of the date of termination.

**Section 7.9    Final Accounting**.

(a)    Manager shall, within thirty (30) days of the date of expiration or termination of this Agreement, deliver to Owner, at Owner's expense, the following:

(1)    An accounting reflecting the balance of income and expenses of the Premises as of the date of termination or expiration of this Agreement.

(2)     Any funds of Owner then held by Manager.

(3)     All executed leases, receipts for deposits, insurance policies, unpaid bills, correspondence and other documents, books and records, which are the property of Owner in the possession of Manager.

If Owner does not object in writing (specifying with reasonable detail the bases for such objections) delivered to Manager within ninety (90) days following Owner's receipt of the foregoing, Owner shall be deemed to have approved and accepted all of the foregoing. Except as provided above, any financial reporting requested by Owner after the expiration or termination of this Agreement (other than the final accounting) shall be prepared by Manager at an hourly rate equal to the fully-loaded costs of personnel performing such services.

## ARTICLE 8
## NOTICES AND ASSIGNMENTS

**Section 8.1     Notice.** All notices, demands, consents, and reports provided for in this Agreement shall be in writing and shall be given to Owner or Manager at the addresses set forth below or at such other address as they individually may specify hereafter in writing:

| | |
|---|---|
| Owner: | Preferred Real Estate Investments, Inc.<br>1001 E. Hector Street, Suite 100<br>Conshohocken, PA  19428<br>Attn: John R. Ahle, Jr.<br>E-Mail: jahle@preferredrealestate.com |
| copy to: | Preferred Real Estate Investments, Inc.<br>1001 East Hector Street, Suite 100<br>Conshohocken, PA  19428<br>Attn: Legal Department<br>E-Mail:  jmatthews@preferredrealestate.com |
| Manager: | Trammell Crow Services, Inc.<br>300 Four Falls Corporate Center<br>300 Conshohocken State Road, Suite 250<br>West Conshohocken, PA  19428<br>Attn: Karen Daly-Smith<br>E-Mail: KDalySmith@trammellcrow.com |
| copy to: | Trammell Crow Services, Inc.<br>2001 Ross Avenue, Suite 3400<br>Dallas, Texas 75201<br>Attn: General Counsel |

Any such notice or other communication shall be deemed received immediately upon delivery in person or three (3) days after being deposited in the United States mail, registered or certified mail, return receipt requested, postage prepaid, addressed to the foregoing address(es).   All

TrammellCrowCompany

notices may be delivered by electronic mail, and such notices shall be deemed received immediately upon effective transmittal.

**Section 8.2    Permitted Assignment.**  Notwithstanding any other provision of this Agreement, Manager shall be permitted to assign all of its right, title and interest in and to this Agreement to an entity affiliated with Manager pursuant to a merger, reorganization or consolidation of Manager or Trammell Crow Company, a Delaware company ("**TCC**") entity with and/or into any other entity directly or indirectly wholly-owned by TCC (an "**Intragroup Merger**"). Any such Intragroup Merger shall not be deemed a breach of, cause a default under or trigger any right of termination under any other provision of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

**Section 9.1    Delegation of Responsibility for Operational Activities.**  Owner agrees and acknowledges that Manager may delegate all or any part of its obligations under this Agreement to a regional affiliate of Manager. Notwithstanding the foregoing, Manager shall continue to be liable under this Agreement for the performance of the Operational Activities.

**Section 9.2    Conflicts of Interest.**  Owner and Manager acknowledge that Manager or an affiliate may be involved in representing other persons in real estate transactions involving Owner or its affiliates or involved in the ownership or management of certain facilities. In the event of a conflict between Manager's representation of Owner under this Agreement with respect to such transaction and the obligations of Manager or its affiliate to another person with respect to such transaction, at Owner's request, Manager shall promptly notify Owner of such conflict and, shall promptly establish appropriate internal procedures to prevent any communication or collusion between those employees of Manager or Manager's affiliates who represent parties in such transactions in which such a conflict of interest may exist, or Owner may require that Manager withdraw from its representation of Owner with respect to such transaction. Further, Owner acknowledges that Manager or Manager's affiliates own interests in persons with whom Owner or Manager may transact business pursuant to this Agreement (such as SiteStuff, Inc., a web-based procurement platform, workplace IQ, an application service provider that licenses the WPIQ real estate database management software, TCC General Agency, Inc., an insurance agency through whom Manager purchases insurance, and Raven Insurance Company, Ltd., a foreign insurance company providing reinsurance).

**Section 9.3    Non-Solicitation.**  Owner acknowledges that Manager's employees in a supervisory position with respect to the Operational Activities (collectively, the "**Key Manager Personnel**") are essential to Manager's core business of providing management services and are familiar with Manager's operating procedures and other information proprietary to Manager. Therefore, without Manager's prior written consent, Owner agrees that neither Owner nor any affiliate of Owner shall directly or indirectly (including, without limitation, assisting any third party service provider to) solicit for employment, solicit to hire, employ, hire, make any agreement with, or permit the employment of, any person who is or has been a member of the Key Manager Personnel within twelve (12) months after the expiration or earlier termination of this Agreement. Owner also acknowledges that a breach of the obligations set forth in this Section would irreparably harm Manager's business and leave Manager without an adequate

TrammellCrowCompany

remedy at law, and that Manager would be entitled to seek injunctive relief to enforce the terms of this Section. This provision shall survive the expiration or earlier termination of this Agreement.

**Section 9.4** **Signs.** At Manager's sole cost and expense, Manager may place and remove, or cause to be placed and removed, such signs upon the Premises which Manager deems reasonably appropriate including, without limitation, a sign announcing that the Premises is under Manager's management; provided that such signs are of a size and location reasonably acceptable to Owner and otherwise in strict compliance with applicable laws. Owner shall have the right at any time to signs as it may require at or on the Premises, without the consent of Manager.

**Section 9.5** **Pronouns.** The pronouns used in this Agreement that refer to Manager shall be understood and construed to apply whether Manager be an individual, partnership, limited liability company, corporation or an individual or individuals doing business under a firm or trade name.

**Section 9.6** **Amendments.** Except as otherwise herein provided, any and all amendments, additions or deletions to this Agreement shall be ineffective unless memorialized in an instrument signed by both Owner and Manager.

**Section 9.7** **Headings.** All headings used herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**Section 9.8** **Representations.** Manager represents and warrants that it has authority to enter into this Agreement and perform all obligations of Manager hereunder. Owner represents and warrants it has lawful possession of the Premises and it has authority to enter into this Agreement.

**Section 9.9** **Complete Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter herein stated and supersedes and takes the place of any and all previous management agreements pertaining to the Premises entered into between the parties hereto.

**Section 9.10** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

**Section 9.11** **Attorney's Fees.** Should any dispute occur between Owner and Manager with respect to this Agreement which results in litigation, the losing party shall pay the prevailing party its attorneys' fees and costs in connection therewith.

**Section 9.12** **Waiver of Jury Trial.** Each party hereto, knowingly and voluntarily, and for their mutual benefit, waives any right to trial by jury in the event of litigation regarding the performance or enforcement of, or in any way related to, this Agreement. Notwithstanding any provision of this Agreement to the contrary, neither party hereto shall be liable for any lost or prospective profits or any other indirect, consequential, special, incidental, punitive or other exemplary losses or damages, whether in tort, contract or otherwise, regardless of the forseeability or the cause thereof.

**Section 9.13   Force Majeure.**   Whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, terrorist acts or activities, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the control of such party.

**Section 9.14   OFAC.**   Owner and Manager each represent and warrant to the other (for themselves, only) that each is currently in compliance with, and shall at all times during the term of this Agreement (including any extension thereof) remain in compliance with, the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

**Section 9.15   Additional Premises.**   Owner and Manager may from time to time, following the execution of this Agreement, amend the exhibits to this Agreement to add additional Premises that will be managed by Manager in accordance with the terms of this Agreement. Any such amendment shall set forth any adjustments to the payments due Manager hereunder, including, without limitation, changes to the Management Fee, as may be determined by the mutual agreement of Owner and Manager.

**Section 9.16   Owner Collective Liability.**   Each Owner hereunder shall be severally but not jointly liable for all obligations of and as "Owner" under this Agreement, and each Owner shall be fully liable for all obligations of and as "Owner" under this Agreement with respect to its Parcel. With respect to any Parcel jointly owned by more than one Owner (a "**Multi-Owner Parcel**"), each Owner shall be jointly and severally liable for all obligations of and as "Owner" under this Agreement with respect to such Multi-Owner Parcel. In the event the Owners of a Multi-Owner Parcel subdivide such Parcel into two or more sub-Parcels (each of which is owned by only one Owner), from and after the effective date of such subdivision, each new sub-Parcel shall constitute a Parcel under this Agreement and shall no longer constitute a Multi-Owner Parcel. Should it be necessary or appropriate to apportion any expense, fee or other obligation of Owner hereunder among the individual Owners, Manager shall determine the formula or method of apportionment, provided however, that such apportionment shall be commercially reasonable under the circumstances.

**Section 9.17   Sale of Parcel.**   In the event any Owner sells, conveys or transfers any Parcel (except to another Owner), the Owner of such Parcel shall give (1) at least thirty (30) days prior written notice to Manager of the expected sale or transfer date and (2) subsequent prior written notice to Manager confirming the actual sale or transfer date. Upon such sale, conveyance or transfer, such Parcel shall no longer be considered a part of the Premises, and Manager shall from the time of such sale, conveyance or transfer have no further obligation under this Agreement with respect to such Parcel. In the event of such sale, conveyance or transfer and following Manager's receipt of the notice described in clause (2) above, such Owner shall be deemed to have terminated this Agreement pursuant to Section 7.2 as of the effective date of such sale, conveyance or transfer. In the event that such sale, conveyance or transfer

Trammell Crow Company

materially affects the overall size or composition of the remaining Premises or Manager's provision of the Services to such remaining Premises, the parties agree to make mutually acceptable and commercially reasonable changes to Manager's Management Fee.

**Section 9.18  Designation of Owner's Agent**.  Each Owner hereby appoints and designates as its authorized agent hereunder Preferred Asset Management, LLC, a Pennsylvania limited liability company (the "**Owner's Agent**").  The Owner's Agent, acting as agent for and on behalf of each Owner, shall perform all operational obligations of Owner under this Agreement and shall serve as the single point of contact for Manager in connection with Manager's performance of the Operational Activities under this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

TrammellCrowCompany

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**MANAGER:**
**TRAMMELL CROW SERVICES, INC.**
a Delaware corporation

By: _____
Print Name: Karen Daly-Smith
Title: Sr. VP, Area Director

**OWNER:**
Hunting Fox Associates I, L.P., a Pennsylvania limited partnership
By:  Hunting Fox I, Inc., its general partner

By: _____
Print Name:  John R. Ahle Jr, SCSM
Title: Vice President


Hunting Fox Associates III, L.P., a Pennsylvania limited partnership
By:  Hunting Fox III, Inc., its general partner

By: _____
Print Name:  John R. Ahle Jr. SCSM
Title: Vice President


Hunting Fox Associates IV, L.P., a Pennsylvania limited partnership
By:  Hunting Fox IV, Inc., its general partner

By: _____
Print Name:  John R. Ahle Jr, SCSM
Title: Vice President


Hunting Fox TCI III, L.P., a Pennsylvania limited partnership
By:  Hunting Fox TCI III, Inc., its general partner

By: _____
Print Name:  John R. Ahle Jr, SCSM
Title: Vice President


Hunting Fox TCI IV, L.P., a Pennsylvania limited partnership
By:  Hunting Fox TCI IV, Inc., its general partner

Trammell Crow Company



By: _____
Print Name: _____ John R. Ahle Jr. SCSM
Title: _____ Vice President

Preferred Asset Management, LLC is executing this Agreement to evidence its acceptance of its obligations as the Owner's Agent, as provided in Section 9.18.

**OWNER'S AGENT:**

**PREFERRED ASSET MANAGEMENT, LLC,**
a Pennsylvania limited liability company

By: _____
_____ John R. Ahle Jr, SCSM
Its: _____ Vice President

Trammell Crow Company

## EXHIBIT A

## DESCRIPTION OF REAL PROPERTY

TO BE ATTACHED BY OWNER

2450 Hunting Park Avenue, Philadelphia, PA  19129

2,150,000 Square Feet

Office/Industrial

Trammell Crow Company

## EXHIBIT B

## REPORTS

Manager shall provide Owner the following reports according to the indicated frequency:

| I. | **Property Management Reports** | **Frequency** |
|---|---|---|
| A. | Project Activities Report<br>Bullet Synopsis of Operational Activities | Monthly |
| B. | Budget Variance Report (Operating and Capital)<br>YTD Narrative of Significant Exceptions | Monthly |
| C. | Aged Receivable Report | Monthly |
| D. | Rent Roll Report | Monthly |
| E. | Gross Sales, Percent Rent Report,<br>[Limited to retail tenants, only to the extent tenants<br>report gross sales] | Monthly |
| F. | Project Summary Report | Monthly |
| G. | Lease Expiration Report - Next 24 Months | Annual |
| H. | Budget<br>- Operating; (Including Marketing and Operations Assumptions)<br>- Capital; (Including Major Repairs and Replacements, T.I.<br>Costs, Lease Commissions | Annual |
| I. | Operating Expense Reconciliation and Recovery | Annual |
| J. | Real Estate Tax; Payments[s] and Recovery | Annual |
| K. | Lease Abstracts (New Leases) | Monthly |

| II. | **Financing Reports** | |
|---|---|---|
| A. | Income Statement | Monthly |
| B. | Accounts Receivable Aging Report | Monthly |
| C. | Balance Sheet | Monthly |
| D. | Bank Reconciliation | Monthly |
| E. | Check Register | Monthly |
| F. | Management Fee Reconciliation | Monthly |

Trammell Crow Company

## EXHIBIT C

## EMPLOYEE COSTS

Owner shall pay to Manager the following costs for reimbursement of property management salaries, direct engineering services and accounting fees.  These costs will be billed to Owner monthly and will be due and payable to Manager.

### Summary of Annual Costs:

| Property Manager/Admin.Costs | Engineering Services * | Accounting Fees | Transition Fees ** |
|---|---|---|---|
| $ 46,575.00 | $90,000.00 | | $ 6,450.00 |

*Engineering Services are based on actual costs incurred and will be billed monthly.

** Transition fees are a one time fee billable within thirty days from the commencement date.

Trammell Crow Company

## EXHIBIT D

## MANAGEMENT OFFICE COSTS

N/A

There is not currently a management office on site at this property.

TrammellCrowCompany

## EXHIBIT E

## SOFTWARE REQUIREMENTS

N/A

Trammell Crow Company

## EXHIBIT F

### CONSTRUCTION MANAGEMENT FEE

The Construction Management Fee shall equal the following percentages of all construction costs incurred in conjunction with any construction, including, but not limited to, capital repairs and improvements, major building reconstruction, and tenant improvements and repairs associated with the project:

Fees should be:

| | |
|---|---|
| $0-$100,000 | 5% with $2,000 minimum |
| $101,000-$300,000 | 4% plus $6,000 |
| $300,001- $1MM | 3% plus $16,000 |
| Above $1MM | 2% plus $44,000 |

If a tenant is performing its tenant improvement work and paying a construction management fee approved by Owner, then Manager shall only be responsible for monitoring the work as Owner's representative and, in such instance, will receive a construction management fee equal to Fifty Percent of the fee that would otherwise be paid as noted above.

Trammell Crow Company